# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2012

Lyle W. Cayce
Clerk

No. 10-11202

NETSPHERE, INC., ET AL,

       Plaintiffs

v.

JEFFREY BARON,

       Defendant - Appellant

v.

ONDOVA LIMITED COMPANY,

       Defendant - Appellee

--------------------------------------------------------------------

CONS. w/ 11-10113

NETSPHERE, INC., ET AL,

       Plaintiffs

v.

JEFFREY BARON, ET AL,

       Defendants

v.

QUANTEC, L.L.C.; NOVO POINT, L.L.C.,

       Movants - Appellants

v.

PETER S. VOGEL,

No. 10-11202

Appellee

-----------------------------------------------------------------------

CONS. w/ 11-10289

NETSPHERE, INC., ET AL,

Plaintiffs

v.

JEFFREY BARON,

Defendant - Appellant

v.

DANIEL J. SHERMAN,

Appellee

-----------------------------------------------------------------------

CONS. w/ 11-10290

NETSPHERE, INC., ET AL,

Plaintiffs

v.

JEFFREY BARON, ET AL,

Defendants

v.

QUANTEC, L.L.C.; NOVO POINT, L.L.C.,

Movants - Appellants

2

No. 10-11202

v.

PETER S. VOGEL,

       Appellee

------------------------------------------------------------------------

CONS. w/ 11-10390

NETSPHERE, INC., ET AL,

       Plaintiffs

  v.

JEFFREY BARON,

       Defendant - Appellant

QUANTEC, L.L.C.; NOVO POINT, L.L.C.,

       Movants - Appellants

  v.

ONDOVA LIMITED COMPANY,

       Defendant - Appellee

PETER S. VOGEL,

       Appellee

------------------------------------------------------------------------

CONS. w/ 11-10501

NETSPHERE, INC., ET AL,

       Plaintiffs

v.

No. 10-11202

JEFFREY BARON,

        Defendant - Appellant

QUANTEC, L.L.C.; NOVO POINT, L.L.C.,

        Movants - Appellants

CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.,

        Appellant

v.

PETER S. VOGEL; DANIEL J. SHERMAN,

        Appellees

--------------------------------------------------------------------------

CONS. w/ 12-10003

NETSPHERE, INC., ET AL,

        Plaintiffs

v.

JEFFREY BARON,

        Defendant - Appellant

QUANTEC, L.L.C.; NOVO POINT, L.L.C.,

        Movants - Appellants

GARY SCHEPPS,

        Appellant

v.

4

No. 10-11202

PETER S. VOGEL,

      Appellee

------------------------------------------------------------------------

CONS. w/ 12-10444

In re: NOVO POINT, L.L.C.,

      Petitioner

------------------------------------------------------------------------

CONS. w/ 12-10489, 12-10657, and 12-10804

NETSPHERE, INC., ET AL,

      Plaintiffs

  v.

JEFFREY BARON,

      Defendant - Appellant

NOVO POINT, L.L.C.; QUANTEC, L.L.C.,

      Movants - Appellants

v.

PETER S. VOGEL; DANIEL J. SHERMAN,

      Appellees

------------------------------------------------------------------------

CONS. w/ 12-11082

NETSPHERE, INCORPORATED, ET AL

      Plaintiffs

No. 10-11202

v.

JEFFREY BARON,

      Defendant - Appellant

QUANTEC L.L.C.; NOVO POINT, L.L.C.,

      Movants - Appellants

v.

PETER S. VOGEL,

      Appellee

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before DeMOSS, SOUTHWICK, and HIGGINSON, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

These consolidated interlocutory appeals arise from the district court's appointment of a receiver over Jeffrey Baron's personal property and entities he owned or controlled.  The district court sought to stop Baron's practice of regularly firing one lawyer and hiring a new one.  This practice vexed the litigation involving Baron's alleged breaches of a settlement agreement and a related bankruptcy.  It also created new claims in bankruptcy by unpaid attorneys.  Baron appealed the receivership order and almost every order entered by the district court thereafter.  We hold that the appointment of the receiver was an abuse of discretion and REVERSE and REMAND.

No. 10-11202

Numerous motions and a writ of mandamus to overturn the bankruptcy court's striking of notices of appeal to the district court are also before us. Most are denied as moot. We address below the motions that remain relevant.

FACTUAL AND PROCEDURAL HISTORY

Jeffrey Baron and Munish Krishan formed a joint venture involving the ownership and sale of internet domain names. Disputes arose between the venturers, resulting in at least seven lawsuits. In April 2009, after four mediation attempts and several years of litigation, Baron, Krishan, and other parties signed a Memorandum of Understanding ("MOU") settling all disputes. Soon, Baron and one of his companies, Ondova Limited Company, allegedly breached the MOU. In May 2009, Krishan and his company, Netsphere, Inc., filed a lawsuit in the United States District Court for the Northern District of Texas to enforce the MOU. That suit is the one from which the current appeals have been brought.

In June 2009, the district court entered a preliminary injunction to compel Baron's compliance with the MOU. That injunction was later amended to include a $50,000 per day penalty for a violation. The injunction was entered to prevent deletion of domain names and to force compliance with parts of the MOU. The district court also began expressing concern with the multitude of lawyers appearing for Baron, concerns that would continue in the months ahead.

In July 2009, Netsphere moved to have Baron held in contempt for violating the preliminary injunction. On the day before the scheduled contempt hearing, Baron caused Ondova to file for bankruptcy, which automatically stayed the district court litigation. Netsphere sought to lift the automatic stay, arguing that the domain names at issue in the lawsuit were not owned by Ondova and were not subject to the stay. Ondova allegedly admitted it did not own the domain names that were the subject of the district court litigation – i.e.,

No. 10-11202

the ones involving plaintiff Krishan and defendant Baron that the settlement provided would be divided between them.

The bankruptcy creditors and Ondova eventually agreed to a settlement, but Baron continued to hire new lawyers. Many of the lawyers claimed they had not been paid and began to file claims for legal fees in the bankruptcy proceedings. In September 2009, in bankruptcy court, Baron asserted his Fifth Amendment right not to answer questions that might reveal he was violating the June preliminary injunction. Six days later, the bankruptcy court appointed Daniel Sherman as Chapter 11 trustee. The bankruptcy court recommended that the district court appoint a special master to mediate among the trustee, Baron, and the attorneys with claims against the Ondova bankruptcy estate, but no master was appointed at that time.

Beginning in February 2010, negotiations began for another settlement. On May 5, 2010, the bankruptcy court held a status conference. If no settlement could be reached by May 14, the bankruptcy judge suggested the trustee file to convert the case to one in Chapter 7. The trustee did so, stating liquidation was in the best interest of creditors. Several hearings were held over the next month. On June 22, 2010, the parties announced a global settlement in principle. At a July 12 bankruptcy court hearing, the parties represented that most issues had been resolved. Two days later at another hearing, the bankruptcy judge approved the settlement subject to six remaining issues.

The settlement, dated July 2, 2010, provided for the division of domain names between companies controlled by Baron and Krishan. The odd-numbered names were assigned to Quantec, LLC, for Baron's benefit, while Manila Industries, Inc. – under Krishan's control – was assigned the even-numbered names. The agreement was not to become effective until the "Settlement Date," which was defined as "the day after the date on which the Bankruptcy Court's order approving this Agreement becomes a Final Settlement Order." On July 28,

2010, the bankruptcy court approved the settlement and ordered it to be fully executed by July 30. The bankruptcy court maintained jurisdiction to resolve disputes arising under the agreement. Attached to the agreement was a "Stipulated Dismissal with Prejudice" of the district court suit. Though signed by the parties and attorneys, the district court never entered the dismissal.

On September 15, 2010, a hearing was held on the settlement agreement. The trustee said that 30 or 40 items in the agreement had been completed and the remaining items were the execution of a supplemental agreement appointing a trustee of a trust and the transfer of domain names to Quantec from Manila.

At this hearing, the trustee's attorney also addressed Baron's repeated hiring and firing of lawyers – he presented a chart identifying 45 lawyers whom Baron had not paid. Gerrit Pronske, one of Baron's former attorneys who was seeking to withdraw, testified that he worked for Baron full-time for six months and had not been paid. Pronske testified that Baron planned to move assets that were at the time subject to jurisdiction in the United States to a trust in a foreign country. The trust to which Pronske was referring was the Village Trust, a Cook Islands entity which owned Novo Point, LLC and Quantec, LLC. Its trustee is SouthPac, which is also a Cook Islands entity, and Baron is the trust's sole beneficiary. Pronske indicated that the assets being transferred out of the United States would have been the principal source of payment for his allegedly unpaid attorney fees. The attorney for the trustee was concerned because the money to pay the lawyers and satisfy other claims would be lost if the domain names that Baron's entities were to own under the settlement left control of the trust that was subject to the court's jurisdiction.

At this point, the bankruptcy judge stated that "no more lawyers [are] going to be allowed. The question is: Whether any are going to be released; is he going to be pro se; or is he going to have lawyers?" In light of those questions, the bankruptcy judge said she was considering recommending the district court

appoint a receiver over Baron and his assets "and let that receiver implement the settlement agreement." Additionally, the bankruptcy court ordered Baron to request from the trust that $330,000 be deposited with the bankruptcy trustee as security, to be held until further court order. The money was deposited and held "to pay [Baron's] obligations."

On October 13, 2010, in a report and recommendation to the district court, the bankruptcy court reported substantial progress toward the settlement, including "steps towards transferring the 'Odd Names Portfolio' portion of the internet domain names to a new Registrar away from Ondova." Included in the order, in bold, was the bankruptcy court's judgment that Baron's hiring and firing of lawyers was exposing the Ondova bankruptcy estate to great expense that should be paid by Baron's other entities such as Quantec and Novo Point. The court expressed it was "perhaps most concerned about the risk that the bankruptcy estate has and will be exposed to administrative expense claims" because of Baron's failure to pay lawyers.

Also in this October 13, 2010 report, the bankruptcy court recommended that the district court appoint Peter S. Vogel as special master to mediate the claims for unpaid legal fees. The bankruptcy court further stated that if Baron chose not to cooperate with final consummation of the settlement, Baron could "expect [it] to recommend to His Honor that he appoint a receiver over Mr. Baron." The court adopted the bankruptcy court's recommendation and appointed Vogel as special master. Baron again fired his attorney. At this point, the bankruptcy trustee filed an Emergency Motion for Appointment of a Receiver over Baron on November 24, 2010. The trustee asserted the receivership was necessary because of Baron's failure to cooperate with the order to mediate the legal-fee claims and his continued hiring and firing of lawyers in violation of the court's order. The trustee argued that Baron's practice of hiring and firing lawyers would expose the bankruptcy estate to additional administrative claims

and further delay the resolution of the bankruptcy proceedings. On November 24, the same day the motion was filed, the district court entered the receivership order without notice to Baron. On December 2, Baron appealed to the Fifth Circuit Court of Appeals and five days later moved for a stay. While "express[ing] no view on the ultimate merits," we held on December 20, that he had made an inadequate showing for a stay. Baron renewed his motion on occasion but was never granted a stay. Somewhat belatedly, we now express our views on the ultimate merits.

In the district court, the receiver moved to revise the receivership order to make it clear that Novo Point, LLC and Quantec, LLC had always been subject to the receivership. The original order identified Novo Point, Inc., and Quantec, Inc., which are actual but distinct legal entities. The two LLCs filed objections on several grounds. At a hearing on December 17, 2010, attorneys for Novo Point, LLC and Quantec, LLC appeared and agreed they were subject to the receivership order. The district court entered an order stating that the receivership had always included Novo Point, LLC and Quantec, LLC and ordered the LLCs to comply with all reasonable instructions given to them by the receiver. On January 28, 2011, the LLCs filed a notice of appeal challenging their inclusion as receivership parties.

On January 4, 2011, the district court held an evidentiary hearing on Baron's motion to vacate the receivership order. A month later, the district court entered an order denying Baron's motion to vacate the receivership. The district court gave six reasons for denying the motion to vacate: (1) "Baron hired and fired counsel in bad faith as a means of delaying court proceedings[;]" (2) "Baron's vexatious litigation tactics have increased the cost of [the] litigation for all parties[;]" (3) "Baron's practice of hiring and firing attorneys exposed the Ondova bankruptcy estate to significant expense[;]" (4) "Baron has repeatedly ignored court orders[;]" (5) "Baron repeatedly hired attorneys in bad faith

No. 10-11202

without the intention of paying them[;]" and (6) "the appointment of a receiver is necessary to stop Baron from attempting to transfer funds outside the jurisdiction of the United States." Nowhere in its order did the district court find that Baron failed to assign half of the domain names as required by the settlement agreement.

Baron appealed the appointment of the receiver and then appealed numerous subsequent orders entered by the district court. An order appointing a receiver is appealable to courts of appeals as a matter of right. 28 U.S.C. § 1292(a)(2).[1] There is less clarity as to which orders during the pendency of a receivership may properly be appealed. As we later discuss, our conclusions about the receivership itself make most of the later appeals irrelevant.

## DISCUSSION

The central issue on appeal is whether a court can establish a receivership to control a vexatious litigant. The district court appointed a receiver primarily to control Baron's hiring, firing, and non-payment of numerous attorneys. The receiver was granted exclusive control over assets, including Baron's personal property, that were not at issue in the underlying litigation over the domain names. We find no authority to permit establishing a receivership for this purpose. We set out below our reasons for that conclusion and its effect on what has occurred since the receivership was put in place.

---

[1] In one of the consolidated appeals in this case, Carrington, Coleman, Sloman & Blumenthal, L.L.P. ("CCSB"), a firm that served as counsel to Baron and Ondova in the bankruptcy proceedings, claimed it is owed $224,232.69 in unpaid fees. CCSB filed a separate appeal from the district court's disbursement order providing for payment to unpaid attorneys. Under the disbursement order, CCSB is to receive no payments from the receivership; instead, CCSB is to be paid out of the Ondova bankruptcy estate. CCSB agreed that this court lacks jurisdiction over CCSB's appeal given that the firm filed a motion to reconsider that remains pending in the district court. *Ross v. Marshall*, 426 F.3d 745, 752, n.13 (5th Cir. 2005).

Thus, the CCSB appeal is dismissed.

No. 10-11202

I.    *Propriety of the Receivership Order*

We review a district court's appointment of a receiver for an abuse of discretion. *Santibanez v. Weir McMahon & Co.*, 105 F.3d 234, 242 (5th Cir. 1997).  Federal Rule of Civil Procedure 66 gives limited guidance, stating that the civil rules govern in an action involving a receiver.  "Under that rule, the appointment of a receiver can be sought 'by anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer.'" *Santibanez*, 105 F.3d at 241 (quoting 7 James Moore et al., Moore's Federal Practice § 66.05[1] (2d ed. 1996)).  Correspondingly, a district court has authority to place into receivership assets in litigation "to preserve and protect the property pending its final disposition." *Gordon v. Washington*, 295 U.S. 30, 37 (1935).  Examples the Court gave of the proper use of a receivership included the preservation of property until the foreclosure of a mortgage, or of trust property until appointment of a new trustee, or of a debtor's property until a judgment creditor has it applied to his judgment. *Id.*  In none of those situations was the receiver named simply to secure or preserve funds for the satisfaction of a potential later judgment.  Receivership is "an extraordinary remedy that should be employed with the utmost caution" and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties. *See* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012); *see also Santibanez*, 105 F.3d at 241-42 (summarizing factors courts must consider before appointing a receiver).

Even if a reasonable basis exists for believing there are benefits to the court and the parties to imposing a receivership, and those reasons likely existed here, resort to that remedy may be inappropriate.  The cases on which the district court initially relied in appointing a receiver establish that the court has

13

inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995). These cases, however, refer to a court's power to dismiss a case with prejudice and the district court's authority to impose monetary sanctions. *Id.*; *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 584 (5th Cir. 2008). In a later order disbursing attorney fees, the district court also relied on precedents stating that a receivership is an equitable remedy. *Santibanez*, 105 F.3d at 241. That is so, but for the reasons discussed below, equity does not allow a receivership to be imposed over property that was not the subject of the underlying dispute.

Receivers have been used in a number of contexts. "Secured creditors, lien- holders, and mortgagees" may seek appointment of a receiver because they "clearly have an interest in the property in which they have a security interest that may provide a basis for convincing the court to appoint a receiver ending a foreclosure suit or any other action to enforce one or more outstanding liens." Wright & Miller, *supra*, § 2983; *see also Bookout v. First Nat'l Mortg. & Disc. Co.*, 514 F.2d 757, 758 (5th Cir. 1975). Additionally, a receivership is a remedy for taking possession of a judgment debtor's property. *Santibanez*, 105 F.3d at 241. A receivership also can be utilized when a judgment creditor seeks "to set aside allegedly fraudulent conveyances by the judgment debtor, or who has had execution issued and returned unsatisfied . . . or who otherwise is attempting to have the debtor's property preserved from dissipation until his claim can be satisfied." *Id.* (quoting Wright & Miller, *supra*, § 2983). Importantly, to justify the appointment of a receiver such claims would already have been reduced to judgment. That was not the case here, as the receivership was deemed imposed for unresolved claims.

The receiver and trustee pointed us to another line of cases where a receivership was proper as an adjunct to injunctive relief for a securities fraud. *E.g.*, *SEC v. Keller Corp.*, 323 F.2d 397, 402 (7th Cir. 1963). Receiverships also

have been upheld in derivative actions by stockholders against corporations to prevent the threatened diversion of assets through fraud or mismanagement. *E.g., Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969). Thus, in cases of non-compliance with SEC regulations, a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors. *Id.*; *SEC v. Hardy*, 803 F.2d 1034, 1035 (9th Cir. 1986). Nonetheless, in a derivative suit or a suit for non-compliance with SEC regulations, the corporate assets are the underlying subject matter of the dispute. Here, the only assets that were the subject matter of the dispute were the domain names that were to be transferred under the settlement agreement. They were transferred.

Last, the receiver and trustee relied on cases where courts appointed receivers to run institutions where constitutional violations were occurring. Such receiverships are generally ordered in the context of ensuring a governmental entity's compliance with court orders. *See, e.g., Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976) (upholding a receivership imposed to insure a high school's compliance with desegregation orders); *Plata v. Schwarzenegger*, 603 F.3d 1088 (9th Cir. 2010) (upholding a receivership to administer and improve prison health care). This is not a case where a governmental organization will not comply with the law. *Plata*, 603 F.3d at 1094.

We now look at the specific arguments for the receivership presented by the receiver and trustee and explain why none is consistent with the limited purposes for this "extraordinary remedy." *Strickland v. Peters*, 120 F.2d 53, 56 (5th Cir. 1941).

### A. *Preserving Jurisdiction and Bringing Litigation to a Close*

Among the justifications presented by the receiver and trustee for the receivership is that it was needed to preserve the court's jurisdiction over Baron's assets, given that one of Baron's former attorneys had testified that

No. 10-11202

Baron intended to move assets outside of the country. They further asserted that the receivership order was a valid exercise of the court's inherent authority because bringing the Netsphere litigation and Ondova bankruptcy to a close required that Baron be prevented from either hiring or firing additional counsel. The receiver halted the hiring and firing of counsel by seizing all of Baron's personal assets and the assets of the companies he controlled.

We first examine the argument that assets needed to satisfy a future money judgment were being transferred beyond the court's jurisdiction. The All Writs Act "empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978); 28 U.S.C. § 1651. This authority, though, "is firmly circumscribed, its scope depending on the nature of the case before the court and the legitimacy of the ends sought to be achieved through the exercise of the power." *ITT Cmty. Dev. Corp.*, 569 F.2d at 1358-59. A court is limited to issuing orders "to curb conduct which threaten[s] improperly to impede or defeat the subject matter jurisdiction then being exercised by the court." *Id.* at 1359.

The jurisdiction "being exercised" by the district court in this case prior to the receivership order was enforcing a settlement agreement and the transfer of domain names, which would end the Netsphere litigation and the Ondova bankruptcy. Baron executed the settlement agreement in July 2010 and agreed to quitclaim the "Even Group" of domain names to Netsphere. Neither the trustee nor the receiver has pointed to record evidence that Baron failed to transfer the domain names in accordance with the agreement. He had other obligations, but there is no record evidence brought to our attention that any discrete assets subject to the settlement agreement were being moved beyond the reach of the court.

16

At a September 15, 2010 hearing in bankruptcy court, the attorney for the trustee gave an update on the parties' progress toward completing the terms of the settlement agreement. In addition to addressing the few minor unresolved issues with respect to domain names to be conveyed to Baron, the trustee's attorney discussed the increasing number of attorneys who had formerly represented Baron and Ondova and were now making claims against the bankruptcy estate. At this point, when the bankruptcy court considered recommending the district court appoint a receiver, the bankruptcy court was not responding to a threatened loss of control over domain names or other discrete property. Instead, it was trying to prevent the loss of the funds necessary to pay the various claims that continued to mount up against the Ondova bankruptcy estate. It was at this hearing that the bankruptcy court heard testimony from Baron's attorney, Pronske, explaining that he had learned Baron was planning to transfer "assets" offshore. Based on these allegations, the bankruptcy court ordered Baron to direct the Village Trust to deposit $330,000 with the bankruptcy trustee as a form of security to pay Baron's "obligations."

Baron continued to hire and fire attorneys, causing the bankruptcy trustee to move for the appointment of a receiver over Baron, followed soon by the district court's *ex parte* appointment of a receiver. In the January 2011 hearing that followed, the district court provided its justifications for appointing the receiver. Those justifications centered almost entirely on the court's concern that Baron's vexatious litigation tactics – particularly the hiring and firing of lawyers – were increasing the costs of litigation and exposing the bankruptcy estate to additional administrative claims. The court briefly mentioned its concern that Baron would transfer "funds" outside of the court's jurisdiction, a concern grounded in the court's desire to fashion a remedy through a receivership to pay the claims of Baron's former attorneys.

17

There certainly was evidence that Baron's actions were disrupting, complicating, and making more expensive both the bankruptcy and the district court suit. We do not, though, find evidence that Baron was threatening to nullify the global settlement agreement by transferring domain names outside the court's jurisdiction. Accordingly, the receivership cannot be justified in this instance on the basis that it was needed to take control of the property that was the subject of the litigation. Rather, the receivership was established to pay the attorneys and to control vexatious litigation. We will now examine each of those reasons.

## B.  Paying Attorneys

The district court in its order establishing a receivership referred to the testimony received by the bankruptcy court on Baron's debts to former attorneys. The district court described those debts as the primary rationale for the receivership. A receiver may be appointed for a secured creditor who has legitimate fears his security may be dissipated; "an unsecured simple contract creditor has, in the absence of a statute, no substantive right, legal or equitable, in or to the property of his debtor." *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923). Baron's former attorneys were free to make claims against the bankruptcy estate. Many had done so. Alternatively, to the extent that they represented Baron or his companies in matters unrelated to the Ondova bankruptcy, the attorneys could file suit in a court of appropriate jurisdiction to collect the fees owed, which many had done. Establishing a receivership to secure a pool of assets to pay Baron's former attorneys, who were unsecured contract creditors, was beyond the court's authority. *Id.*

Moreover, for those unpaid attorneys who had filed claims, the claims had not been reduced to judgment such that a receiver would have been proper to "set aside allegedly fraudulent conveyances by [Baron]." *Santibanez*, 105 F.3d at 241. "[R]eceivers may be appointed to preserve property pending final

determination of its distribution in supplementary proceedings in aid of execution." *Id.* (internal quotation marks omitted). They may also be properly appointed for a judgment creditor who "is attempting to have the debtor's property preserved from dissipation until his claim can be satisfied." *Id.*

Although the attorneys' allegations and claims were delaying the district court and bankruptcy proceedings, they were not the subject matter of the underlying litigation. "The general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment." *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988). *Fredeman* involved a civil action under RICO for treble damages. *Id.* at 822. The district court entered a preliminary injunction that effectively froze all of the defendants' assets, which were unrelated to the underlying lawsuit, based solely on the need to protect the potential RICO judgment. *Id.* at 825. This court set aside the injunction as an improper exercise of the court's equitable powers. *Id.*

In setting aside the injunction in *Fredeman*, this court relied on *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 222-23 (1945). *Id.* In *De Beers*, the government sought and obtained a pretrial preliminary injunction freezing the domestic assets of a foreign corporation suspected of violating antitrust laws. *DeBeers*, 325 U.S. at 215. The government argued that freezing the corporation's assets was the only method of ensuring compliance with future court orders. *Id.* The government also speculated that the corporation would withdraw its domestic assets in an effort to evade the jurisdiction of the courts of the United States. *Id.* at 215-16. Though the Supreme Court acknowledged a court's inherent power to protect its jurisdiction, it concluded that the injunction exceeded the court's powers. *Id.* at 222-23. The Court explained that if it were to hold otherwise, every plaintiff in an action for a personal judgment would apply for a "so-called injunction sequestrating his opponent's assets

pending recovery and satisfaction of a judgment . . . . No relief of this character has been thought justified in the long history of equity jurisprudence." *Id.*

In a more recent articulation of its "cautious approach to equitable powers," the Supreme Court stated that equity is "confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322, 329 (1999). The Court identified the issue as being "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310. The Court answered "no." *Id.* at 333. The opinion thoroughly reviewed the breadth of equitable powers before reaching that conclusion. *Id.* "[F]ederal courts in this country have traditionally applied the principle that courts of equity will not, as a general matter, interfere with a debtor's disposition of his property at the instance of a nonjudgment creditor." *Id.* at 329. We conclude that the limits of equity there described are relevant to the receivership remedy, too.

The trustee and receiver are correct that *Grupo Mexicano* involved a claim only for money damages, in which the district court improperly relied on its equitable authority to issue a preliminary injunction to preserve a fund. Even so, the Court detailed the relevant principles that confine the equitable power of federal courts. *Id.* at 319-22. It rejected that the merger of law and equity had altered the relevant limitations on that power. *Id.* at 322. The *Grupo Mexicano* Court distinguished its ruling from a case in which the suit sought the equitable relief of contract rescission and restitution. *Id.* at 325 (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287-88 (1940)). The equitable relief was not, therefore, simply in aid (as in *Grupo Mexicano*) of a legal claim for a money judgment. *Id.* The case before us is similar to *Grupo Mexicano* to the extent that the receivership remedy was for the purpose of controlling Baron's

ausing

hold

transferring of funds that were to be paid to attorneys – nonjudgment creditors. This receivership was intended to control vexatiousness, but it is more similar to *Grupo Mexicano* than it is to *Deckert*.

While these precedents dealt with injunctions, the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships. A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy. *Cochrane v. W.F. Potts Son & Co.*, 47 F.2d 1026, 1029 (5th Cir. 1931). In *Cochrane*, a holder of corporate bonds, which were alleged to be part of a fraud scheme, sought the establishment of a receivership. *Cochrane*, 47 F.2d at 1027. The bondholder only claimed an interest in one series of bonds – series E. *Id.* at 1028. The district court appointed a receiver over the series E bonds as well as five other series that were not part of the underlying complaint. *Id.* This court held that the district court only had jurisdiction over the series E bonds, which were the subject of the litigation. *Id.* at 1029. Because the district court lacked subject matter jurisdiction over the other bonds, which were not at issue in the litigation, it lacked authority to appoint a receiver over them. *Id.*

The receivership ordered in this case encompassed all of Baron's personal property, none of which was sought in the Netsphere lawsuit or the Ondova bankruptcy other than as a possible fund for paying the unsecured claims of Baron's current and former attorneys that had not been reduced to judgment. The receivership also included business entities owned or controlled by Baron, including Novo Point, LLC and Quantec, LLC. Although Novo Point and Quantec were listed as parties on the global settlement agreement, they were never named parties in the Netsphere lawsuit or the Ondova bankruptcy. We conclude the district court could not impose a receivership over Baron's personal property and the assets held by Novo Point and Quantec.

## C.   Controlling Vexatious Litigation

Baron's vexatious litigation tactics were his ignoring court orders and hiring and firing of attorneys, which delayed court proceedings, increased the general cost of litigation, and increased expenses for the bankruptcy estate. Such tactics, though, have not been recognized as a basis for invoking the equitable remedy of a receivership. A receiver has been allowed to halt fraudulent, evasive litigation tactics, but only when a specific provision of the Internal Revenue Code applied. *In re McGaughey*, 24 F.3d 904 (7th Cir. 1994); *United States v. Bartle*, 159 F. App'x 723 (7th Cir. 2005) (unpublished). In *McGaughey*, the court derived its power to appoint a receiver to collect unpaid taxes from a specific provision of the Code. *In re McGaughey*, 24 F.3d at 907. A district court may use authority from 26 U. S. C. § 7403 to appoint a receiver over a debtor's assets in a proceeding to enforce a tax lien if the Government makes the necessary showing of need. *Id.* *Bartle* did not provide its own extensive analysis but relied on *McGaughey* to support a receiver for that purpose. *Bartle*, 159 F. App'x at 725. Here, unlike in *McGaughey* and *Bartle*, the court had no statutory authority to appoint the receiver nor were the receivership assets at issue in the litigation.

Baron's longstanding vexatious litigation tactics presented the district court with an exceedingly difficult situation. The district court recognized that it had the inherent authority to address those tactics. At the beginning of the suit, the district court entered a preliminary injunction to compel compliance with the first settlement agreement – i.e., the MOU. The court later held a hearing to address Baron's non-compliance with the preliminary injunction. The injunction was amended to include a $50,000 per day penalty for a violation. When Baron's hiring and firing of attorneys were first addressed, the court found clear and convincing evidence of Baron's contempt of court and said it could employ such tools as monetary sanctions or jailing Baron until he complied with

court orders. The court concluded, though, that these remedies were insufficient because Baron had repeatedly ignored court orders.

If the district court entered a sufficiently specific order, it could have held Baron in contempt, imposed a fine or imprisoned him for "disobedience . . . to its lawful . . . command." 18 U.S.C. § 401. At oral argument in the appeal, it seemed conceded that no clear order existed. Instead, the receiver and trustee cited only to hearings at which the district court admonished Baron not to hire or fire any more attorneys. Whether there was a clear order ultimately does not matter in our resolution. The question before us concerns the receivership.

The district court also could have required Baron to proceed with the same lawyer or pro se at his choice. *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1263 (5th Cir. 1983) (explaining that the right to retain the counsel of one's choosing may be restricted where it is misused "for purposes of delay or obstruction of the orderly conduct of the trial" and when "the needs of effective administration of justice" so require). The court noted some of these remedies and determined they would be inadequate. No authority has been cited to us, though, that a receivership becomes appropriate when traditional means might not fully prevent a litigant from engaging in vexatious litigation tactics.

A court has undeniable authority to control its docket but not through creating a receivership over assets, including personal assets, that were not the subject of the litigation. The terms of the receivership order had far-reaching implications for Baron's personal property. For example, the receiver was empowered to take possession of Baron's mobile phone and computers and to divert mail. Baron was required to turn over his bank accounts and keys to any property he owned or rented, including his own home. Moreover, when Baron needed funds for medical care, he had to request such funds from the receiver.

We conclude that the receivership improperly targeted assets outside the scope of litigation to pay claims of Baron's former attorneys and control Baron's

litigation tactics. This was an improper use of the receivership remedy. The order appointing a receiver is vacated.

## II.    The Receivership Fees

When a receivership is proper, the general rule is that receivership fees and expenses "are a charge upon the property administered." *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994); *see also Atl. Trust Co. v. Chapman*, 208 U.S. 360, 374 (1908). When a receivership is improper or the court lacks equitable authority to appoint a receiver, the party that sought the receivership at times has been held accountable for the receivership fees and expenses. *W.F. Potts & Co. v. Cochrane*, 59 F.2d 375, 377-78 (5th Cir. 1932). Baron relied on a somewhat later case for the same point. *Porter v. Cooke*, 127 F.2d 853 (5th Cir. 1942). That court held that "the parties whose property has been wrongfully seized are entitled, on equitable principles, to recover costs from those who have wrongfully provoked the receivership." *Id.* at 859. In the present case, no party "provoked" the receivership. The bankruptcy court recommended a receiver, and the trustee then moved in district court for the appointment as recommended.

We discover no controlling rule on assessing costs for an improperly created receivership other than that equity is the standard. For example, in *W.F. Potts*, this court evaluated the assignment of responsibility for the receivership fees by recognizing that the district court itself ordered the receivership. *W. F. Potts*, 59 F. 2d at 377-78. After holding that the receivership should not have been imposed, we rejected that the party who sought the receivership had to bear its costs:

> [The parties whose assets were seized] treat the matter too much as though this were a suit for the wrongful and forcible taking of property by plaintiff or its agents. They overlook the fact that, though it is true that one who invokes without sufficient equitable grounds the administration by a receiver of the property of another

No. 10-11202

> may be in a proper case held accountable for the costs and expenses
> of the receivership and for losses which the receivership has visited
> upon the property, the appointment of a receiver is at last the
> court's appointment; the administration, its administration. We
> think it perfectly clear that in a case like this, where there was no
> malice nor wrongful purpose, and only an effort to conserve property
> in which plaintiff believed, though it did not show, it was interested,
> the question of its liability should be considered and adjudged from
> the standpoint of working as little hardship as may be, plaintiff in
> the end to be held liable for only the actual losses which its
> mistaken course has caused.

*Id.* (citations omitted). An equitable allocation was ordered. The plaintiff who sought the receivership was not charged with disbursements that benefitted the fund, but it was ordered to reimburse the defendant for actual losses to the fund. *Id.* at 379.

With a similar focus on equity, the Supreme Court evaluated how to assign the costs of an improper receivership created by a federal court when that court had erroneously concluded that a state court receivership no longer had possession of the relevant property. *Palmer v. Texas*, 212 U.S. 118, 125-26 (1909). The Court reversed the lower court's assessment of the costs against the party who had sought the receivership, because the Court concluded "that justice will be done if the costs of the receivership are paid out of the fund realized in the Federal court . . . ." *Id.* at 132.

These precedents are consistent with analysis in one of our precedents that without "convincing evidence that the appointment of a receiver was either collusive, capricious, venal, or in bad faith," ordinarily the expenses of the receivership will not be charged "other than against the fund administered by the receiver, even though the [c]ourts are vested with a discretion in determining who should pay the costs and expenses of a receivership in unusual instances." *Commercial Nat'l Bank v. Connolly*, 176 F.2d 1004, 1009 (5th Cir. 1949). In holding that the receivership expenses should be paid out of receivership funds,

25

we reasoned that, though appointment of a receiver was a "mistake," the large recovery by the plaintiffs in the trial indicated the receivership was not "needless." *Id.* On remand, the lower court was to enter a decree directing the receiver to pay one-fourth of the costs of the retrial and appeal, the party moving for the receiver to pay one-half, and the intervenors one-fourth. *Id.* at 1010.

We do not find that Baron received any benefit from this receivership. Nonetheless, these precedents establish that equity controls when addressing the costs created by an improper receivership. Here, the record supports that the circumstances that led to the appointment of a receiver were primarily of Baron's own making. The district court had an array of fairly onerous remedies to apply but chose another remedy that it did not have. The manner in which the district court responded to those circumstances was errant, but the court's perception was reasonable that a vigorous response was required.

We must decide how equitably to resolve this misapplication of an equitable remedy. Baron did in fact contend that the appointment of the receiver was in bad faith or collusive but fails to convince. He supported the argument by saying the appointment was prohibited by law by virtue of the receiver's previous appointment as special master. Baron relied on this statutory language: "A person holding any civil or military office or employment under the United States or employed by any justice or judge of the United States shall not at the same time be appointed a receiver in any case in any court of the United States." 28 U.S.C. § 958. The trustee pointed out that a special master is neither an employee of the United States nor of the judge who appointed him. While the special master is subject to the court's supervision, his fee is paid by the parties to the litigation, not the court. Fed. R. Civ. P. 53(g)(2). The fact that the receiver was previously special master is no indication of bad faith or collusion in the appointment of the receiver.

No. 10-11202

Additionally, we hold, based on this record, that in creating the receivership "there was no malice nor wrongful purpose, and only an effort to conserve property in which [the court] believed" it was interested in maintaining for unpaid attorney fees and to control Baron's vexatious litigation tactics. *W.F. Potts*, 59 F.2d at 377-78. We recognize that the district court was dealing with a conundrum when it decided to appoint the receiver – the problem was great, but standard remedies seemed inadequate. We also take into account that, to a large extent, Baron's own actions resulted in more work and more fees for the receiver and his attorneys. For these reasons, charging the current receivership fund for reasonable receivership expenses, without allowing any additional assets to be sold, is an equitable solution.

In light of our ruling that the receivership was improper, equity may well require the fees to be discounted meaningfully from what would have been reasonable under a proper receivership. Fees already paid were calculated on the basis that the receivership was proper. Therefore, the amount of all fees and expenses must be reconsidered by the district court. Any other payments made from the receivership fund may also be reconsidered as appropriate.

We also conclude that everything subject to the receivership other than cash currently in the receivership, which Baron asserts in a November 26, 2012 motion amounts to $1.6 million, should be expeditiously released to Baron under a schedule to be determined by the district court for winding up the receivership. The new determination by the district court of reasonable fees and expenses to be paid to the receiver, should the amount be set at more than has already been paid, may be paid from the $1.6 million. To the extent the cash on hand is insufficient to satisfy fully what is determined to be the reasonable charges by

the receiver and his attorneys, those charges will go unpaid. No further sales of domain names or other assets are authorized.[2]

## III.  Other Issues

Baron raised other issues related to the receivership. Additionally, there are multiple outstanding motions. We address those that would remain unresolved despite our holding that the receivership was improper.

### A.  Subpoena of IOLTA Account

Baron contended the district court erred in allowing the receiver to subpoena bank records related to Baron's attorney's IOLTA account. When the receiver learned that Baron's attorney, Gary Schepps, was paying another Baron attorney through an IOLTA account, he served a subpoena on the bank holding the account. The receiver argued that Baron was using the account to hide receivership assets and retain additional counsel in defiance of the district court's orders.

The receiver argued that the issue regarding bank records is moot given that the subpoena issued, the bank produced the records, and the receiver has reviewed them. An appeal must be dismissed when "an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party." *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008). Yet, an appellate court's "continued jurisdiction does not depend upon being able to provide complete relief; if there is some means by which we can effectuate a partial remedy, this case remains a live controversy." *In re Sec. Life Ins. Co. of Am.*, 228 F.3d 865, 870 (8th Cir. 2000). The records have been produced and reviewed by the receiver and there is no

---

[2] We stayed the closing on sales resulting from an auction of domain names. Our ruling means no closing may occur, and the stay is made permanent.

relief that this court can provide. Baron's challenge to the subpoena of his attorney's IOLTA account is moot.

### B.    Section 144 Affidavit

On April 27, 2011, Baron filed a motion for leave to file a motion for recusal under 28 U.S.C. § 144. Baron attached to the motion an affidavit detailing his allegations of bias. At the hearing on Baron's motion, the court instructed Baron to file a second affidavit with appropriate record citations to statements by the court that Baron believed evidenced bias. Baron's attorney assured the court that providing record cites would be "no problem" because "everything in the affidavit is directly cut and pasted from the record."

The court then entered an order granting Baron's motion for leave to file a second affidavit, but only under the condition that Baron submit an affidavit with record citations. On May 6, 2011, Baron's attorney informed the district court that a new affidavit was ready, but that it did not comply with the court's record cites requirement. In his supplemental affidavit, Baron alleged that the district court had "a personal bias against giving credence to allegations of poor conduct by attorneys" and that his personal bias had allowed Baron to be victimized by his opponents – many of whom were attorneys. The district court struck the new affidavit, but it allowed Baron to file another affidavit provided that it complied with the court's original order. Baron never submitted a compliant affidavit and did not re-urge his motion to disqualify.

Baron contended that the district court erred in refusing to rule on the legal sufficiency of the affidavits. The receiver argued that Baron waived this issue by failing to file an affidavit that complied with the court's order.

"A judge is to recuse himself if a party to the proceeding makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party." *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483 (5th Cir. 2003)

(internal quotation marks omitted). A district court's ruling with respect to a Section 144 affidavit is appealable under 28 U.S.C. § 1292(b). *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 517 F.2d 1044, 1047 (5th Cir. 1975).

When a motion is filed under Section 144, the district court "must pass on the legal sufficiency of the affidavit" without passing on the truth of the matter asserted. *Davis*, 517 F.2d at 1051. "A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature." *Patterson*, 335 F.3d at 483.

Based on our reading of the record, the district court considered Baron's original affidavit, determined that it was insufficient, and ordered Baron to correct the deficiency by including citations to the record. Baron filed a second affidavit and admitted that it did not comply with the court's order. The district court struck the affidavit, but left Baron the option of filing another affidavit provided it had record cites. Baron never filed a compliant affidavit; therefore, he has waived the issue on appeal.

### C. *Outstanding Motions & Mandamus*

In light of our holding that the receivership order was improper, we need not address the outstanding motions that were carried with the case. Similarly, we do not find it necessary to address Novo Point's petition for a writ of mandamus, which challenged the bankruptcy court's decision to strike various notices of appeal filed by Novo Point. The bankruptcy court struck these notices based on its finding that they violated the terms of the receivership order – which we have now set aside.

The judgment appointing the receiver is REVERSED with directions to vacate the receivership and discharge the receiver, his attorneys and employees, and to charge against the cash in the receivership fund the remaining receivership fees in accordance with this opinion.

No. 10-11202

Carrington, Coleman, Sloman and Blumenthal, LLP's appeal of the district court's disbursement order is DISMISSED.

Baron's challenge to the subpoena of his attorney's IOLTA account is DENIED as moot.

Baron's challenge to the denial of his Section 144 affidavit was waived.

Should we not have addressed a motion that a party believes still needs a ruling, that claimed oversight should be suggested on rehearing.