

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 26, 2013**

United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Jeffrey Baron, | § | Bankruptcy Case No. |
| | § | 12-37921-SGJ-7 |
| Alleged Debtor. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER FOR RELIEF ON INVOLUNTARY BANKRUPTCY PETITION**

On June 17-18, 2013, this bankruptcy court held an evidentiary trial with regard to an involuntary Chapter 7 bankruptcy petition that was filed by various petitioning creditors against an alleged debtor, Mr. Jeffrey Baron ("Mr. Baron" or the "Alleged Debtor"). The sole issue before the court at the trial was whether an Order for Relief should be entered against Mr. Baron, pursuant to the standards set forth in Section

1

303(h) of the Bankruptcy Code.[1]  Specifically, the court earlier ruled that the petitioning creditors had proper standing to file the involuntary petition, pursuant to the standards set forth in Section 303(b) of the Bankruptcy Code (this was in connection with a motion for partial summary judgment that had addressed that sole issue).[2]  After deliberating upon the evidence, the totality of circumstances, and the relevant law, this bankruptcy court now decides that an Order for Relief should be issued and that Mr. Baron should be a debtor in bankruptcy under Title 11. The following are the court's findings of fact, conclusions of law, and order in support of this determination.

---

[1] Section 303(h) provides that, whenever an involuntary bankruptcy petition is filed and then timely controverted, the court, after a trial, shall order relief against the debtor in the involuntary case "only if — (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or (2) within 120 days before the date of the filing of the petition, a custodian [which is defined in Section 101(11) of the Bankruptcy Code as, among other things, a "receiver . . . of any of the property of the debtor, appointed in a case or proceeding not under this title"], other than one appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien, was appointed or took possession."  11 U.S.C. § 303(h).

[2] Section 303(b) provides that an involuntary bankruptcy case may be commenced against a person "by three or more entities, each of which is . . . a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $15,325" in unsecured amount.  Note, that if there are fewer than 12 creditors of an alleged debtor, only one petitioning creditor with this size noncontingent, undisputed claim is necessary to file an involuntary petition.  11 U.S.C. § 303(b).

A.    JURISDICTION AND OTHER PROCEDURAL MATTERS

1.    The trial on the involuntary petition was a contested matter.  Fed. R. Bankr P. 1018 and 9014.  Bankruptcy subject matter jurisdiction existed in this contested matter pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court had authority to exercise the bankruptcy subject matter jurisdiction in the contested matter, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.  Additionally, statutory "core" matters were involved in this contested matter, as contemplated by at least 28 U.S.C. §§ 157(b)(2)(A) and (O).  Section 303 of the Bankruptcy Code is the substantive statutory authority that was most germane to this matter.

2.    The petitioning creditors filed the involuntary bankruptcy petition against Mr. Baron on December 18, 2012.  The petitioning creditors are various lawyers and law firms that have performed legal services for Mr. Baron and, in some cases, also for entities with which Mr. Baron is affiliated.  Specifically, the petitioning creditors are:  Pronske & Patel, P.C. (alleging a $294,033.77 claim); Shurig Jetel Beckett Tackett (alleging a $93,731.79 claim); Dean Ferguson (alleging a $73,885 claim); Gary G. Lyon (alleging a $75,922.22 claim); Robert J. Garrey (alleging a $52,275 claim); Powers Taylor, LLP (alleging a $78,058.50

claim); Jeffrey Hall (alleging a $5,000 claim); and, later by joinder, David L. Pacione of the law firm of Brian J. Judis (alleging a $10,018.30 claim) (hereinafter, the "Petitioning Creditors"). The eight Petitioning Creditors assert claims in the aggregate sum of $682,924.58.

3. As will later be discussed, Mr. Baron has spent enormous amounts of time engaging lawyers, in the past decade, purportedly to protect his complex business interests. Mr. Baron has frequently not paid these lawyers. This is why this case presents the unusual situation of lawyers being the Petitioning Creditors.

4. This contested matter took several months to reach trial due to several reasons including: (a) bifurcation of the issues (the parties requested that the court first decide, in a summary judgment fashion, after briefing and oral argument, whether the Petitioning Creditors had *standing* to file the involuntary petition under section 303(b)—*i.e.,* did the Petitioning Creditors constitute "three or more entities, each of which is . . . a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $15,325"); (b) then there was a temporary abatement of the involuntary bankruptcy case to allow certain Fifth Circuit appellate

4

proceedings involving Mr. Baron, which the court considered relevant, to reach conclusion; and (c) then the court ordered mediation of these matters and related matters to occur which was presided over by a retired bankruptcy judge (and despite reports of significant efforts on the part of many, the matters did not settle).

5. With regard to the bifurcated (and earlier-decided) issue of whether the Petitioning Creditors had standing to file the involuntary bankruptcy case under section 303(b) of the Bankruptcy Code, the argument of the Petitioning Creditors was that the claims of the Petitioning Creditors against Mr. Baron are "not contingent as to the liability or the subject of a bona fide dispute as to liability or amount" as a matter of law **because of an order issued by Senior District Judge Royal Furgeson (Retired) on May 18, 2011 (later to be described)**. This court agreed with the Petitioning Creditors. To understand the significance of this May 18, 2011 order and the bankruptcy court's ruling on section 303(b), as well as the overall context for this involuntary bankruptcy filing, and the issues tried involving section 303(f), some litigation history involving this Alleged Debtor should be discussed.

**B. LITIGATION HISTORY PRIOR TO THE TRIAL ON THE JEFF BARON INVOLUNTARY BANKRUPTCY PETITION**

6. This is the second bankruptcy case involving Mr. Baron.

Almost four years ago, a ***business entity*** controlled by Mr. Baron, known as Ondova Limited Company, also known as Compana, LLC or budgetnames.com (hereinafter, "Ondova"), filed a ***voluntary*** Chapter 11 bankruptcy case in this same bankruptcy court, on July 27, 2009 (Case No. 09-34784-SGJ-11). Mr. Baron was Ondova's former president and its ultimate indirect equity owner.

7. Ondova was formerly in the business of being an internet domain name registrar ("Registrar"). Specifically, Ondova was a type of "middle man" company that, for a fee, would register a ".com" or ".net" domain name for a person wanting to own and use a domain name (the latter being referred to as a "Registrant"). Ondova performed this "middle man" registration activity pursuant to a license it had from the Internet Corporation for Assigned Names and Numbers ("ICANN")—which is, essentially, a creature of the United States Department of Commerce—and also pursuant to an agreement with Verisign, Inc. ("Verisign")—which is a private corporation that essentially acts as the operator of the huge ".com" and ".net" registries. Verisign is not in any way related to Ondova.[3]

8. A few weeks after the Ondova bankruptcy case was commenced, this bankruptcy judge ordered the appointment of a

---

[3] As is fairly well known, an "internet domain name" is a term that most typically ends in the characters ".com" or ".net" (in the United States) and is essentially an internet address. Domain names are similar to "virtual real estate" on the world wide web.

Chapter 11 Trustee (the "Ondova Chapter 11 Trustee"), on September 11, 2009 [DE (Ondova) # 85],[4] when certain creditors of Ondova and the bankruptcy court became concerned that Mr. Baron did not understand basic fiduciary duties and did not want to cooperate in many regards. Among other things, Mr. Baron was hiring and firing lawyers repeatedly (*i.e.,* he fired Ondova's very capable bankruptcy counsel just a few weeks into the case, for no apparent reason, and also hired and fired numerous lawyers who were representing him personally), and he also did not wish to testify on certain relevant subjects (asserting his Fifth Amendment privilege against self-incrimination, rather than testifying about the business affairs of Ondova). The United States Trustee, thus, appointed an individual named Daniel J. Sherman as the Ondova Chapter 11 Trustee (hereinafter so called) on September 17, 2009 [DE (Ondova) # 98]. No party ever appealed the order directing the appointment of the Ondova Chapter 11 Trustee.

9. During the Ondova bankruptcy case, it was reported by parties that there were hundreds of thousands of ".com" and ".net" domain names (perhaps 600,000 in number) (hereinafter, "Domain Names") that had been owned by various offshore

---

[4] "DE (Ondova) # _" as used herein refers to the Docket Entry number at which a pleading is filed in the docket maintained by the Bankruptcy Clerk in the bankruptcy case of *In re Ondova Limited Company*, Case No. 09-34784-SGJ-11 .

companies/trusts that Mr. Baron owned/controlled, or that were owned by a joint venture of which Mr. Baron was a participant, and some Domain Names were even owned by Ondova.[5]  Specifically, Ondova was **not** typically serving as registrar of domain names to random members of the public so much as it was serving as a registrar to offshore trusts and companies that owned the Domain Names (and that were, in turn, controlled by Mr. Baron and affiliates).  As for the Domain Names, at least some large portion of them were subject to claims of trademark-infringement (also known as "cyber-squatting") and posed litigation risks and burdens, while others of these Domain Names were possibly valuable, and still others were not-so-valuable.[6]

---

[5] The term "ownership" *vis-a-vis* an internet domain name is somewhat imprecise.  A member of the public can register a domain name for use on the internet, and thereby become known as the "registrant" for the name.  This is more similar to a lease right to use the name, as opposed to ownership of the name.  Obviously, there are often individuals or companies who register a trademark for certain names and these people are more in the nature of owners.

[6] This bankruptcy court had an opportunity to review a list of the Domain Names at a confirmation hearing in the Ondova bankruptcy case in November 2012 and found that they could be described and categorized as follows:  (a) a relatively small percentage of the Domain Names are what the court referred to as generic names (*e.g.*, "eyedoctors.com" or "dinnerware.com") that do not appear to be obviously trademark-infringing in any way (hereinafter, the "Generic Names"); (b) a large percentage of the Domain Names are what the court referred to as intentionally misspelled names (hereinafter, the "Typosquatting Names")—in other words, names that any reasonable person would consider strikingly similar to some commercial entity that likely owns a trademark in connection with its business (such as a banking institution or movie company), but certain letters had been transposed or added to the Domain Name such that the Domain Name is not exactly the same as the commercial business's name (e.g., "wellsfagro.com"); (c) another portion of the Domain Names are names of schools, cities, and municipalities that may not be trademarked

10.    There was various litigation regarding these Domain Names—the most significant of which litigation was pending in the United States District Court for the Northern District of Texas, Dallas Division (Senior District Judge Royal Furgeson (Retired)).[7]  The litigation pending before Judge Furgeson (which had been commenced **prior** to the filing of the Ondova bankruptcy case) was styled *NetSphere Inc., Manila Industries, Inc. and Munish Krishan v. Jeffrey Baron and Ondova Limited Company,* Civil Action No. 3:09-CV-0988-F (the "Judge Furgeson District Court Action").  The Judge Furgeson District Court Action had grown very contentious even before the Ondova bankruptcy case was filed and apparently Mr. Baron had hired and fired several sets of lawyers during that litigation.

11.    Eventually, a Mutual Settlement and Release Agreement

---

("Institutional Names"); (d) another portion of the names are in the nature of gaming ("Gaming Names"); and (e) a large portion of the Domain Names are clearly, under the "know-it-when-you-see-it" definition of former Justice Potter Stewart, pornography-oriented ("Pornography Names").  Within the category of Pornography Names was a disturbing subset of Domain Names that no reasonable person could deny are descriptive of child pornography ("Child Pornography Names"). There were also a small percentage of very disturbing racial/hate crime oriented names ("Race/Hate Names").  Upon information and belief, the Ondova Chapter 11 Trustee and Receiver have worked to deactivate the Child Pornography Names and Race/Hate Names and promised to report them to appropriate law enforcement officials for such officials to presumably take appropriate action as they may deem fit. [DE (Ondova) # 944 (at paragraph 12)].

[7] It probably should be noted that there was litigation involving Mr. Baron and Ondova and other entities with which Mr. Baron was associated (concerning Domain Names and/or his business) in various other fora—not just the bankruptcy court and District Court for the Northern District of Texas.

(the "Global Settlement") was negotiated by the Ondova Chapter 11 Trustee and approved by the bankruptcy court on July 28, 2010 [DE (Ondova) # 394] that appeared to resolve not only many of the issues in the Ondova bankruptcy case, but also the Judge Furgeson District Court Action, plus many other pending lawsuits and disputes in various courts involving Mr. Baron (in numerous jurisdictions). This Global Settlement was the product of months of negotiations, drafting and overall hard work. There were dozens of parties to this Global Settlement, including Mr. Baron and various offshore entities that Mr. Baron controlled directly or indirectly.[8] Unfortunately, the euphoria over the Global Settlement having been reached was short-lived. The Global Settlement was *nearly* fully implemented, but *not quite*. Shortly after the Global Settlement was inked, Mr. Baron again hired and fired more lawyers. Mr. Baron began taking actions that this court and certain parties believed were aimed at unraveling the

---

[8] At hearings in the Ondova bankruptcy case during year 2010, it was represented that Mr. Baron and/or Ondova had connections or affiliations with at least the following entities, and many of these parties (if not all) were parties to the Global Settlement: the DayStar Trust (apparently the sole member/100% owner of Ondova, with Mr. Baron being the trustee and sole beneficiary of the Daystar Trust); the Village Trust and MMSK Trust (two Cook Island trusts apparently created by Mr. Baron and Manilla/NetSphere principals in a 2005 joint venture between them); Belton Trust (sole member of Domain Jamboree, LLC); and the following United States Virgin Island entities—HCB, LLC; RIM, LLC; Simple Solutions LLC; Search Guide LLC; Blue Horizons LLC (f/k/a Macadamia Management, LLC); Four Points LLC; Marshden, LLC; Novo Point, Inc.; Iguana, Inc.; Quantec, Inc.; Diamond Key, LLC (nominee of Javelina, LLC); Manassas, LLC (nominee for Shiloh LLC).

Global Settlement, driving up costs, and delaying the Ondova bankruptcy case.

12. Eventually, at the request of the Ondova Chapter 11 Trustee, Judge Furgeson appointed a receiver (the "Receiver") over Mr. Baron's assets and personal affairs. Judge Furgeson did this within the confines of the pending Judge Furgeson District Court Action (when referred to separately, the "Receivership Action"). Judge Furgeson signed an Order Appointing Receiver on November 24, 2010, as clarified by a second order on December 17, 2010 (collectively, the "Receivership Orders") [DE (Furgeson) ## 130, 176].[9] The Receivership Orders did the following, among other things: (a) put the assets and business affairs of Mr. Baron into a personal receivership (the "Receivership"), with an individual named Peter S. Vogel as the Receiver—mostly so that the Global Settlement could be at long—last fully and finally implemented through an independent party stepping into Mr. Baron's shoes, so to speak; and (b) clarified that various entities that Mr. Baron seemed to control, including one entity named Novo Point and another entity named Quantec, were parties included as part of the Receivership (the "Receivership Parties"). Novo Point and Quantec collectively owned well over 100,000 Domain Names.

---

[9] "DE (Furgeson) # _" as used herein refers to the Docket Entry number at which a pleading is filed in the docket maintained by the District Court in the Judge Furgeson District Court Action.

13.    It should be noted that, by the time of the issuance of the Receivership Orders, the concerns regarding Mr. Baron's actions had escalated from being not simply that he would not take every last step required under the Global Settlement (causing the Ondova bankruptcy estate and other parties enormous expense and delay), but also that:  (a) certain of his revolving door of lawyers were going to make "substantial contribution claims" against the Ondova bankruptcy estate (see 11 U.S.C. § 503(b)(3)(D) and (4)); (b) even if these lawyers did not make "substantial contribution claims," the mere fact that Mr. Baron was hiring and firing so many personal lawyers was driving up administrative costs for the Ondova estate since the Ondova case professionals were having to interact with them; and (c) new concerns had been raised that Mr. Baron was transferring assets offshore (or making assets even **harder-to-reach** offshore), perhaps for the purpose of defrauding creditors.[10]

---

[10]   To illustrate Mr. Baron's habit of hiring and firing lawyers, here is just one example.  Even **before** the filing of the Ondova bankruptcy case (and well before the establishment of the Receivership) there were a staggering number of lawyers on the scene that appeared to have represented Ondova, Mr. Baron, or some affiliate.  The Ondova Schedule F (signed under penalty of perjury by Mr. Baron) listed 93 potential unsecured creditors, **24 of which were law firms (in each case, the Schedule F description was "Legal fees asserted to be due," and in every single case these law firms' claims were listed as "disputed")**.  Only five of these 24 law firms ultimately filed proofs of claim in the Ondova case.  In any event, it was never envisioned, in the beginning of the Ondova bankruptcy case, that things would evolve to the point of being "all about lawyer claims." At the beginning of the Ondova bankruptcy case, it was represented to the bankruptcy court that the Ondova case would be mostly about resolving the Manilla/NetSphere disputes and dealing with costly

14.    Subsequently, Mr. Baron appealed the Receivership Orders.   Mr. Baron also appealed several dozen of the various orders issued by Judge Furgeson *during* the Receivership Action. These dozens of appeals were pending at the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") until late 2012.

15.    On December 18, 2012, the Fifth Circuit issued a ruling holding that the appointment of the Receiver was in error and that the District Court should expeditiously wind up the Receivership (although no mandate immediately issued).   The Fifth Circuit, in its ruling, suggested that different remedies as to Mr. Baron would have been more appropriate than imposing an equitable receivership, such as imposing monetary sanctions or incarceration for contempt of court.   *Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012).

16.    On that same day (December 18, 2012), shortly after the Fifth Circuit issued its ruling, the involuntary bankruptcy

---

trademark infringement claims (notably, 44 potential trademark and other Lanham Act related claims were represented to be pending against registrants of Domain Names, on which Ondova had served as registrar, and Ondova, as registrar, was feared to be subject "to an assertion of similar liability."   *See* Schedule F, [DE (Ondova) #50].   Very few of these trademark claimants filed proofs of claim in the Ondova bankruptcy case, although, notably, The University of Texas filed a $4.5 million proof of claim with respect to trademark infringement, accusing Mr. Baron, Ondova and other persons and affiliates of engaging in bad faith usage of numerous University of Texas trademarks through registration of domain names that were identical or confusingly similar to registered trademarks of the University of Texas. [Ondova, Claims Register, Proof of Claim # 12, with attachment)].

petition against Mr. Baron was filed by the Petitioning Creditors.

17.   The filing of the involuntary bankruptcy petition created an automatic stay of actions that had been commenced against Mr. Baron in the various fora. 11 U.S.C. § 362(a).

18.   It was soon reported to the bankruptcy court at a status conference that motions for rehearing *en banc* were being pursued by multiple parties at the Fifth Circuit, concerning the upsetting of the Receivership, and that additional briefing had been requested by the Fifth Circuit.  The bankruptcy court lifted the automatic stay to allow that process to proceed.  The court also excused the Receiver (whose continuing status was unclear–given the ruling and ongoing rehearing activity at the Fifth Circuit) from complying with section 543 of the Bankruptcy Code (especially since it was also unclear whether this involuntary bankruptcy case would/should proceed or not).

19.   On April 24, 2013, the Fifth Circuit denied the motions for rehearing, finalizing its opinion declaring the Receivership was in error, and issued a mandate to the District Court to vacate the Receivership and discharge the Receiver, his attorneys and employees, and to charge the remaining fees against cash in the Receivership.  The Fifth Circuit instructed that the Receiver should expeditiously release the assets subject to the Receivership, after consideration and payment of the appropriate

amount of post-Receivership professional fees and expenses, under a wind-down schedule to be determined by the District Court. The Fifth Circuit instructed that the fees and expenses of the Receiver and his professionals and the Chapter 11 Trustee's professionals incurred in connection with the Receivership (and earlier allowed) should perhaps be reconsidered with new perspective, in light of the Fifth Circuit's overturning of the Receivership. Judge Furgeson later determined the appropriate allowable post-Receivership professional fees and expenses that should be charged against the Receivership (*i.e.,* a reduced amount) [DE (Furgeson) # 1287].

**C.   STANDING OF THE PETITIONING CREDITORS UNDER SECTION 303(b)**

20.   As mentioned earlier, this bankruptcy court was asked to bifurcate the issues in this involuntary case and first determine, in summary judgment fashion, whether the Petitioning Creditors met the standards of Section 303(b) to have properly commenced an involuntary case.

21.   The Petitioning Creditors argued that their claims against the Alleged Debtor could not, as a matter of law, be deemed to be the subject of a "bona fide dispute" because of events that happened during the Receivership.

22.   By way of background, soon after the District Court issued its Receivership Orders in November and December 2010, Mr. Baron began challenging the Receivership Orders through post-

trial motions and appeals. Then, on February 3, 2011, the District Court denied a motion by Mr. Baron to vacate the Receivership Orders and also *denied a stay pending appeal* (after oral argument on December 17, 2010 and full evidence on January 4, 2011). Mr. Baron was subsequently unsuccessful in obtaining any stay pending appeal from the Fifth Circuit. *Thus, activity in the Receivership Action essentially marched on for several months—there being no stay in place.*

23. One such activity that "marched on" in the Receivership Action was activity concerning the many *pre-Receivership lawyer claims that seemingly had accumulated against Mr. Baron and affiliates.*

24. The Receiver desired to determine which of the overwhelming number of lawyer claims that were starting to loom against Mr. Baron and/or Ondova were allowable and should be paid from Receivership assets.

25. To be clear, Mr. Baron had retained, then jettisoned, a staggering number of lawyers. Twenty-four of these lawyers (or law firms) had actually been scheduled as creditors in the Ondova bankruptcy case, but many of these lawyers appeared to have done work for Mr. Baron personally (or perhaps jointly and severally for Mr. Baron and Ondova—or even for other trusts or entities

associated with Mr. Baron).[11]  Some of these lawyers had appeared
in court actions (filing notices of appearance) and some had not.
New lawyers were telephoning the Receiver and Ondova Chapter 11
Trustee on a regular basis announcing that they were representing
Mr. Baron on one issue or another.  Certain lawyers did not know
about other lawyers doing the same thing.  It became mind-
numbing.  More to follow on this.

26.  Eventually, on April 28, 2011, the District Court held
a hearing on the Receiver's Request for Assessment and
Disbursement of Former Attorney Claims.  The record presented to
the bankruptcy court at the summary judgment hearing on the
Section 303(b) issues reflected that there had been notice to Mr.
Baron and others of this April 28, 2011 District Court hearing;
there had been 22 affidavits of approximately 22 law firms that
were filed in the District Court asserting claims against Mr.
Baron personally; and that Mr. Baron filed responses to many of
these refuting them.  The record further reflected that, at the
hearing before the District Court, many of the 22 affiants
testified.  Mr. Baron was present at the hearing with counsel
(this time an attorney named Gary Schepps)[12] and Mr. Baron's

---

[11] *See* n. 10, *supra*.

[12] By the way, the evidence at the trial on the involuntary
petition was that attorney Gary Schepps now claims to be owed between
$2 million and $4 million by Mr. Baron for his appellate work for Mr.
Baron in challenging the establishment of the Receivership.

counsel cross-examined certain attorneys. Mr. Baron himself took the witness stand but invoked the Fifth Amendment right not to testify to avoid self-incrimination in response to questions about his objections to the lawyers' claims. Mr. Baron put on no controverting evidence. *A District Court Order was thereafter entered, concluding that Mr. Baron owed 22 law firms for legal services in the total amount of $870,237.19 (this was after applying a $400 per hour rate cap; the aggregate amount without the rate cap would have been $1,453,208.27)*. The order that the District Court entered will hereafter be referred to as the "May 18, 2011 Fee Order" [DE (Furgeson) # 575].

27. As mentioned earlier, it was on December 18, 2012, that the Fifth Circuit issued its first opinion overturning the Receivership Orders and giving instructions to the District Court to expeditiously wind up the Receivership (although no mandate *per se* issued at this point in time). But on December 31, 2012, the Fifth Circuit issued an order that has sometimes been referred to as a "Clarification Order" which stated that *"The district court orders that were in place prior to the release of our opinion remain in place."* See *Netsphere, Inc. v. Baron*, Appeal No. 10-11202, Doc. No. 00512097486, at p. 6 (5th Cir. Dec. 31, 2012). To be clear, as earlier mentioned, activity in the Receivership Action "marched on" during the appeals of the Receivership Orders because no stay pending appeal was ever

18

issued.  Many orders were entered during the Receivership Action.
Dozens of these orders were appealed.  The Fifth Circuit never
specifically ruled on these numerous appeals of these numerous
orders.  Rather, on December 31, 2012, the Fifth Circuit issued
an order that **"The district court orders that were in place prior
to the release of our opinion remain in place."**  *Id.*  The Fifth
Circuit never changed this in its April 4, 2013 order denying
rehearing *en banc* or in the mandate issued on April 19, 2013.
*See Netsphere, Inc. v. Baron*, Appeal No. 10-11202, Doc. No.
00512198098 (5th Cir. April 4, 2013); *Netsphere, Inc. v. Baron*,
Appeal No. 10-11202, Doc. No. 00512215228 (5th Cir. April 19,
2013); *NetSphere Inc., Manila Industries, Inc. and Munish Krishan
v. Jeffrey Baron and Ondova Limited Company,* Civil Action No.
3:09-CV-0988-F, DE ## 1255, 1256, 1257, 1258, 1259, 1260, 1261,
1262, 1263 (N.D. Tex. April 24, 2013).

        28.  Against this backdrop, the sole issue presented on the
question of whether the Petitioning Creditors had standing under
Section 303(b) to file the involuntary bankruptcy petition
against Mr. Baron was **whether the May 18, 2011 Fee Order issued
by the District Court, and perhaps prior orders entered by this
court in the Ondova bankruptcy case, foreclosed any argument as
to the existence of a "bona fide dispute" as to the Petitioning
Creditors' Claims.**

        29.  The May 18, 2011 Fee Order issued by Judge Furgeson

19

bore the following title: "Findings of Fact, Conclusions of Law, and Order on Assessment and Disbursement of Former Attorneys." This Order, according to the Petitioning Creditors' interpretation of it, allowed approximately 22 different lawyers or law firms claims against Mr. Baron in the aggregate amount of $870,237.19. The eight Petitioning Creditors were in the group of those 20-something lawyers.

30. One Petitioning Creditor, Pronske & Patel, also pointed to a further order of this bankruptcy court entered in the Ondova bankruptcy case on November 30, 2012, allowing Pronske & Patel a Section 503(b)(4) "substantial contribution claim" in the Ondova bankruptcy case, in the amount of $294,033.87, which this court allowed as a claim that Pronske & Patel incurred while representing Mr. Baron during the Ondova bankruptcy case, that this bankruptcy court found resulted in a "substantial contribution" to the Ondova case.

31. Both the May 18, 2011 Fee Order and the bankruptcy court's November 30, 2012 Substantial Contribution Order were appealed by Mr. Baron, but there was no stay pending appeal in place as to them at the time the involuntary bankruptcy petition was filed against Mr. Baron. At least no stay, *per se*. Mr. Baron pointed to an Order entered by Judge Furgeson on June 18, 2012, that at least temporarily forbade payment of the attorney's fees allowed in the May 18, 2011 Fee Order until the Fifth

Circuit had ruled on various appeals pending before it relating to Mr. Baron [DE (Furgeson) # 987]. Mr. Baron's counsel argued to the bankruptcy court that this Order was tantamount to a stay pending appeal.

32. This court has held in the past in *In re Henry S. Miller Commercial, LLC*, 418 B.R. 912 (Bankr. N.D. Tex. 2009) that an unstayed judgment, even if on appeal, is not the subject of a bona fide dispute for purposes of Section 303(b) of the Bankruptcy Code. This court's and other courts' rationales for ruling this way has been that such a judgment would be an enforceable judgment, and an involuntary bankruptcy case ought to be allowed to be pursued as an enforcement remedy, same as any other collection remedy a judgment creditor may take on an unstayed judgment. In *Henry S. Miller*, this court cited, among other authority, the Fifth Circuit's *Sims* decision, which basically holds that a bankruptcy court should apply an objective standard in this context, and not go behind the judgment and try to predict the judgment debtor's chances of success on appeal. *Subway Equip. Leasing Corp. v. Sims (In re Sims),* 994 F.2d 210, 220-21 (5th Cir. 1993). In other words, an appeal alone does not create a bona fide dispute. But, in *Henry S. Miller*, after examining various authority, this court **did** state that in a highly specialized fact pattern, a court could conceivably be guided to make an exception to the general rule recognizing the

finality/enforceability of an unstayed judgment.

33. This court, in deciding the Section 303(b) standing issue, had to analyze the dispute before it in three main ways. First, did the Petitioning Creditors have the equivalent of a final judgment with regard to the May 18, 2011 Fee Order of Judge Furgeson, even though it did not *per se* have that in its title? Second, if the Petitioning Creditors did have the equivalent of a final judgment, was it to be considered unstayed and enforceable? Third, if the court got past those two hurdles, was there a highly specialized fact pattern here, so that the court should nevertheless find a bona fide dispute remaining between the Petitioning Creditors and Mr. Baron (or at least find that the Orders were not dispositive on the issue)?

34. Peeling back the onion on the May 18, 2011 Fee Order, it arose out of a motion filed by the Receiver asking for approval for him to make disbursements to various attorneys who asserted attorneys fees claims against Mr. Baron. The Receiver had acted as a mediator as to those numerous claims being asserted. There had actually been more that $1.4 million worth of attorneys fees asserted against Mr. Baron personally. The May 18, 2011 Fee Order reflected that the Receiver had been through an extensive process of assessing how much in legitimate legal fees were out there chargeable against Mr. Baron. The May 18, 2011 Fee Order reflected that Judge Furgeson considered not just

the Receiver's motion (which was a fourth amended motion on this subject) but also a counter-motion, numerous responses, replies, declarations and related pleadings.  Approximately 14 such pleadings were specifically identified in Judge Furgeson's May 18, 2011 Fee Order.  Judge Furgeson stated in his May 18, 2011 Fee Order that he heard substantial evidence and argument in connection with reaching the order.  Among the evidence were more than 25 declarations with exhibits.  Many of these declarants appeared and made themselves available for cross-examination by Mr. Baron at the hearing held on the matter.  The May 18, 2011 Fee Order reflected that ultimately the Receiver had proposed a settlement and compromise of the former attorney claims (which proposed a very large discount for the attorney fees) and Mr. Baron (who was represented in May 2011 by attorney Gary Schepps) was given the opportunity to defend against or challenge the proposed compromised fee amounts suggested by the Receiver.  Mr. Baron would not testify and did not have any refuting evidence. The court even allowed a post-trial brief of Mr. Baron (but no post-trial supplemental evidence).  The May 18, 2011 Fee Order was ultimately issued.  It analyzed the various case authority that dictates the standards that courts should apply in analyzing proposed settlements, including *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 88 S. Ct. 1157 (1968) and *United States v. AWECO, Inc. (In re AWECO,*

*Inc.)*, 725 F.2d 293 (5th Cir. 1984), and ultimately held that what the Receiver had proposed was fair and equitable, in the best interests of all parties concerned, and consistent with the Receiver's fiduciary duties. The May 18, 2011 Fee Order ultimately ordered the Receiver to pay various attorneys fees claims set forth in the order once he had obtained cash and also received certain waivers (those waivers being attorneys' waivers of rights to punitive damages or amounts greater than $400 per hour for their time). Finally, Judge Furgeson stated that Mr. Baron's right to bring counterclaims for such things as malpractice was reserved and the waivers that might be granted by any of the attorneys would not be effective in the event Mr. Baron did bring claims against the attorneys in the future—in such event, the attorneys could bring as an offset claims for punitive damages and claims for their fees beyond the rate of $400 per hour.

35. This bankruptcy court, on balance, believed and still believes that the May 18, 2011 Fee Order is tantamount to a final judgment that forecloses an argument of a bona fide dispute. While it does not have the name "judgment" on it, and it was issued in the context of a proposed compromise or settlement offered up by the Receiver, the fact is that it was actually, fully litigated by the same parties here today. In Texas, collateral estoppel applies where "(1) the facts sought to be

24

litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 351 n.4 (5th Cir. 2004). Each condition must be met in order for collateral estoppel to apply. Three additional sub-factors are important in determining whether the facts of the first action were fully and fairly litigated: "(1) whether the parties were fully heard, (2) whether the court supported its decision with a reasoned opinion, and (3) whether the decision was subject to appeal or was in fact reviewed on appeal." *State Farm Fire & Cas. Co. v. Fullerton*, 118 F.3d 374, 382 (5th Cir. 1997).

36. Collateral estoppel may be used in an offensive manner, and trial courts have broad discretion as to whether offensive collateral estoppel may be permitted. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979).

37. The fact is, all of those elements have been met in connection with the May 18, 2011 Fee Order. A close analogy to the May 18, 2011 Fee Order is the situation in a Chapter 11 bankruptcy case, when there are multiple professional fee applications pending before the court, and the judge appoints a fee examiner to act as essentially a court-appointed expert and make a report as to what fees are reasonable or not. The court

can then accept that report as some evidence. And then all parties-in-interest have the opportunity to cross-examine the fee claimants and put on their own refuting evidence. At the end of that all, the court will allow fees either in accordance with the fee examiner's report or not. The bankruptcy court's order in that context is very much an enforceable order that can be used offensively by fee claimants in the future. The fact here that Judge Furgeson preserved Mr. Baron's ability to bring malpractice claims and the attorneys' rights to assert additional claims in the future does not take away from the finality of the order. It simply carved out what was or was not being litigated and adjudicated.

38. At the time that the involuntary petition was filed against Mr. Baron, there was also a question of whether there was something tantamount to a stay pending appeal in place with regard to the May 18, 2011 Fee Order. Mr. Baron's counsel pointed to an Order of Judge Furgeson dated June 18, 2012 entitled "Order Regarding Motion to Clarify Instruction to Receiver on Payments to Former Baron Attorneys." The context of that Order was that, at some point during the Receivership Action, Judge Furgeson essentially stayed further administrative activity in the Receivership Action because Mr. Baron was appealing every order entered and it was causing enormous court time at various levels. Apparently a motion was filed by the

26

Receiver to clarify whether he should or should not pay the attorneys fees set forth in the May 18, 2011 Fee Order.  Judge Furgeson answered "no"–and instructed the Receiver to segregate and set aside funds for the attorneys fees' payment but that the Receiver should not actually pay them.

39.   While this was a close call, the court did not believe this to be tantamount to a stay pending appeal.  The bankruptcy court believed it was simply an administrative order stating that Judge Furgeson did not want any disbursements made at that stage of the Receivership.  The order did not have the effect of suggesting anything about the merits of the appeal—whether there might be a substantial question on the law in connection with the appeal of the order that, in Judge Furgeson's view at that time, might create a bona fide dispute.

40.   **In any event, these issues are presently mooted**.  The Fifth Circuit has ruled on a final basis in connection with the Receivership Action.  It held that the Receivership Orders were in error, **but the Fifth Circuit did not set aside or overturn in any way the May 18, 2011 Fee Order.  All appeals of it have been exhausted.**  The bankruptcy court considers the May 18, 2011 Fee Order to have established the claims of 20-something lawyers/law firms, including the Petitioning Creditors.  There are no specialized circumstances that warrant disregarding this.

41.   For all these reasons, the court has found that the

27

Petitioning Creditors had standing under Section 303(b) to commence the involuntary petition. Their claims can no longer be argued to be the subject of a "bona fide dispute."

**D. SECTION 303(h) ISSUES**

42. The last question presented—the one that was the subject of evidence on June 17-18, 2013—is whether an Order for Relief is appropriate pursuant to Section 303(h) of the Bankruptcy Code.

43. Section 303(h) provides that, whenever an involuntary bankruptcy petition is filed and then timely controverted, the court, after a trial, ***shall*** order relief against the debtor in the involuntary case "***only*** if — (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; ***or*** (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized ***to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien***, was appointed or took possession. 11 U.S.C. § 303(h) (emphasis added).

44. Section 303(h)(2) was not focused on by the parties at trial (rather Section 303(h)(1) was), but, since subsection (2) deals with the situation in which there has been a "custodian" in place within 120 days before the date of the filing of the

involuntary petition, it cannot be overlooked.

45.    The Bankruptcy Code defines a "custodian" as any one of the following:

> (A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;
>
> (B) assignee under a general assignment for the benefit of the debtor's creditors; or
>
> (C) trustee, receiver or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors.

11 U.S.C. § 101(11) (2010).

46.    "Custodian" appears to encompass a wide variety of any type of trustee, receiver, liquidator, or assignee for creditors— regardless of whether they were appointed by a state court or entitled to possession of the debtor's assets pursuant to contractual provisions or otherwise.  *Bakonyi v. Boardroom Info. Sys. (In re Quality Laser Works)*, 211 B.R. 936, 943 (B.A.P. 9th Cir. 1997) *aff'd*, 165 F.3d 37 (9th Cir. 1998).[13]

47.    Thus, Bankruptcy Code Sections 101(11) and 303(h)(2) read together appear to mean that when there has been any type of

---

[13] In *In re Quality Laser Works*, the Ninth Circuit Bankruptcy Appellate Panel affirmed the decision of the bankruptcy court and found that a liquidating partner of a Chapter 7 debtor partnership was a custodian, because he "[was] in possession of all of [debtor's] accounts receivable, work in process, and bank accounts. Only a few items of equipment or inventory were left behind at the business premises." *In re Quality Laser Works*, 211 B.R. 936, 944 (B.A.P. 9th Cir. 1997) *aff'd*, 165 F.3d 37 (9th Cir. 1998).

custodian (including receiver) appointed or authorized to take charge of "substantially all" of the debtor's property in the 120 days before bankruptcy, an order for relief shall be entered (with no need to inquire about whether the debtor has generally been paying his debts as they have become due). *In re Pallet Reefer Co.*, 233 B.R. 687, 691 (Bankr. E.D. La. 1999) (court found that an order for relief could be entered in an involuntary Chapter 7 case on the grounds that a liquidator had been appointed for debtor-partnership less than 120 days prior to the petition date, even though the petitioning creditor had basically conceded that debtor was solvent and the creditor was unable to produce any evidence of the debtor's nonpayment of its debts). The appointment of a custodian over "substantially all" of a debtor's property serves as a clear signal of financial distress, and appears to establish a conclusive presumption that creditors are entitled to involuntary bankruptcy relief against a debtor. In other words, a finding under 303(h)(2) creates an assumption that a debtor is not able to generally pay his debts as they become due. The legislative history observes that "once a proceeding to liquidate assets has been commenced, the debtor's creditors have an absolute right to have the liquidation (or reorganization) proceed in the bankruptcy court and under bankruptcy laws with all of the appropriate creditor and debtor protections that those laws provide." S. REP. NO. 95-989, at 34,

30

(1978), *reprinted in* U.S.C.C.A.N. 5787, at 5820, 1978 WL 8531.
Additionally, further legislative comment under Section 303(h)(2)
is even more explicit: "If a custodian of all or substantially
all of the property of the debtor has been appointed, this
paragraph creates an irrebuttable presumption that the debtor is
unable to pay its debts as they mature." S. REP. NO. 95-989, at
34, (1978), *reprinted in* U.S.C.C.A.N. 5787, at 5820, 1978 WL
8531.

48.   But what about the fact that the Receivership that had
been in place here for well more than 120 days before the
involuntary petition was filed was ***declared invalid*** just hours
before the involuntary case was itself filed?  Does that matter
under section 303(h)?  This court has found no case law with
similar facts.  But on balance, this court finds that it should
matter.

49.   Normally, as stated above, there would be a conclusive
presumption that creditors are entitled to involuntary bankruptcy
relief against a debtor if the debtor had been in a receivership.
Creditors can opt for a different forum, typically, if they do
not like the way the receivership remedy is proceeding.  But the
fact is that, here, the alleged debtor did not want a receiver
and a higher court had just ordered that the Receivership be
dissolved.  The court believes that, under all the circumstances
here, it is necessary to analyze this filing under section

303(h)(1) of the Bankruptcy Code, rather than simply presume that the creditors are automatically entitled to an order for relief by virtue of the Receivership that existed for more than 120 days before the bankruptcy filing.

50. Thus, turning to section 303(h)(1) of the Bankruptcy Court, the court must analyze whether Mr. Baron is generally not paying his debts as they become due, unless they are the subject of a bona fide dispute. This court has already held for purposes of the Section 303(b) analysis that the Petitioning Creditors' claims are not the subject of a bona fide dispute by virtue of the May 18, 2011 Fee Order and this would also apply to all other attorneys' claims that were addressed in the May 18, 2011 Fee Order. As a reminder, the May 18, 2011 Fee Order reached the conclusion **that Mr. Baron was liable to 22 law firms for legal services in the total amount of $870,237.19 (this was after applying a $400 per hour rate cap; the aggregate amount without the rate cap would have been $1,453,208.27)**. This court sees no reason to analyze the "bona fide dispute" standard any differently under Section 303(h)(1) than it did for Section 303(b). The May 18, 2011 Fee Order is no longer subject to review under any further appeals. Any subjective disagreement that Mr. Baron may have with regard to these fees is now irrelevant. *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 220-221 (5th Cir. 1993).

32

51. The evidence at trial was that Mr. Baron has no other material debt in his life other than these attorneys fees and any other attorneys fees that have accumulated post-Receivership. He has no home mortgage. No car loans. No student loans. No credit cards. The evidence was that he pays his normal life expenses (medical bills, utilities, household expenses), in the ordinary course as they become due.

52. But these life expenses are negligible compared to the huge attorneys fees that Mr. Baron has long-accumulated.

53. The evidence at trial came through 22 lawyer/creditor affidavits submitted by the Petitioning Creditors and 14 affidavits submitted by Mr. Baron (from mostly health care providers) regarding Mr. Baron's payment practices. The court also heard live testimony from Mr. Baron, Gerrit Pronske (representative of a Petitioning Creditor), and Blake Beckham (a former lawyer for Mr. Baron and Ondova who is not a creditor).

54. The totality of this evidence was that Mr. Baron has a long history of generally not paying his (and Ondova's and other affiliated entities') debts relating to legal services as they become due. But he pays his very modest living expenses such as doctors' bills (and he has insurance that covers some portion of that). As set forth above, there are many hundreds of thousands of dollars of legal bills long overdue just from the pre-Receivership period. The evidence was that a post-Receivership

attorney, Gary Schepps, claims to be owed $2 million-$4 million.

55.   There is case law from this district and other districts that is instructive on how to analyze this situation.

56.   First, case law instructs that the relevant standard for determining whether a debtor is generally paying his debts as they become due is "flexible and involves consideration of the totality of the circumstances and requires a balancing of the interests of the alleged debtor against the interest of its creditors." *In re Town of Westlake, Tex.*, 211 B.R. 860, 864 (Bankr. N.D. Tex. 1997).

57.   Second, courts typically hold that, under Section 303(h)(1) of the Bankruptcy Code, "generally not paying debts" includes regularly missing a significant number of payments **or** regularly missing payments which are significant in amount in relation to the size of the debtor's operation.  *In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980); *see also Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir. 1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11-CV-2603-D (N.D. Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where

34

bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350-51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

58. But the final question in this court's mind is whether this should all be analyzed differently, since Mr. Baron's assets have been tied up in a Receivership for almost three years (a Receivership that was overturned by the Fifth Circuit) and, arguably, Mr. Baron has not had the ability to generally pay his

debts as they become due? This court does not believe Mr. Baron has a persuasive argument in this regard. The evidence reflected that there was more than enough value from the assets in the Receivership to pay the legal fees (if Mr. Baron had wanted to pay the fees and cease the Receivership at any time). Moreover, the history here (partially discussed earlier) cannot be ignored.

59. The court, looking at the totality of evidence, and looking at the whole history before and after the Receivership, finds itself asking **why did Mr. Baron engage so many lawyers and why were the fees so high?** How did it get to this point? The evidence has revealed that there were a multitude of factors at play here. For one thing, Mr. Baron's web of offshore entities (apparently first created in the year 2005) made life complicated. Corporate, tax, and other business lawyers were a necessary part of the offshore structure. For another thing, there were numerous claims, demands, and lawsuits regarding alleged trademark infringement with regard to many of the Domain Names. This had to be addressed by lawyers. Additionally, Mr. Baron occasionally found himself in business disputes with various business partners (such as in the case of Manila/NetSphere). This bankruptcy court finds from the evidence that Mr. Baron has spent an enormous amount of time engaging lawyers with an eye toward protecting his business interests. The court further finds that Mr. Baron simply does not have the

background or business experience and sophistication to have a sense for what reasonable lawyer practices and fees should be. Mr. Baron testified that he graduated from University of Texas with an undergraduate business degree in 1989.  He testified that, because of health problems, he had an irregular and sparse work history between 1989-1999.  Then, Mr. Baron began the domain name activities/business.  ***Mr. Baron appears to know a lot about the internet and domain names but either does not have the most basic knowledge regarding what legal work entails or does not know that lawyers expect to be paid for their services just like any other vendor in the market place.***  Mr. Baron testified that he essentially thought everything was negotiable and some of the lawyers had a tendency to churn fees.  He thought it was sometimes unreasonable to pay amounts given the size of his business and assets on hand. In any event, the evidence was clear that Mr. Baron has an undeniable pattern of frequently ending lawyer engagements as soon as the lawyers have done a lot of work and start sending bills to him (and he seems to always think the bills are unreasonable).[14]  The evidence was that Mr. Baron has rarely paid his lawyers other than with up front partial retainers that they have demanded or a small percentage of what they later accumulate.  Mr. Baron accumulates enormous legal

---

[14] Mr. Baron testified that he had only actually terminated one lawyer, but the court did not find this credible.

fees because of his complicated business structure; the frequency with which he or his businesses sue and get sued; the litigiousness with which he approaches lawsuits; the frequency with which he appeals; and the abortive attempts at settlement.

59.   Mr. Baron has long been not paying his enormous legal fees as they generally become due.  Thus, an Order for Relief should issue, pursuant to Section 303(h)(1) of the Bankruptcy Code.  This is not simply an ugly situation of attorneys "lining up at the trough."  This is about Ondova, Mr. Baron, and Mr. Baron's business structure and business model having a constant-need for lawyer assistance, and then not paying for delivered services.  Arguably, some of these lawyers probably should have known better.  But that does not change the fact that Mr. Baron hired them, asked them to perform services, they did, and then he did not pay them.

Based on the foregoing, a separate **ORDER FOR RELIEF** shall immediately issue.

Further based on the foregoing, a separate order will be issued henceforth regarding the turnover of assets from the Receiver to the Bankruptcy Trustee.

**IT IS SO ORDERED.**

**\*\*\*\* END OF ORDER \*\*\*\***